UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:18-CR-24-HAB |
| | ) | |
| ANTHONY HENDERSON | ) | |

**OPINION AND ORDER**

This matter comes before the Court on Defendant's objections to the draft presentence investigation report. (ECF No. 97). Defendant advances two objections affecting his guideline calculation: the total drug weight attributed to Defendant and the application of the two-level enhancement under U.S.S.G. § 2D1.1(b)(12). An evidentiary hearing was held on July 15, 2020, and both parties have submitted briefs. (ECF Nos. 109, 110). This matter is now ripe for review.

**A.   Drug Quantity**

Defendant's objection to the drug quantity focuses on two caches of drugs. Defendant first objects to counting approximately 18 grams of fentanyl that were "available" to Defendant but never delivered to him. Second, he objects to counting several pills found during the search of a bedroom attributed to Defendant. The Court will discuss each objection in turn.

**1.   *Factual Background***

Defendant was a member of an organization that called themselves the "Thrust Godz." The leader of the group was Vorheese Zanders. Part of Zanders' role as leader was to maintain the group's stash of fentanyl. Members seeking to sell fentanyl would have to go to Zanders, pay him for the needed amount, and then Zanders would provide the drugs. Zanders always required payment up front; drugs were never fronted.

Following Zanders' arrest, the role of leader was handed down to Curtis Bryant. As part of the transfer of authority, Zanders gave Bryant a ledger showing how the fentanyl stash was to be allocated. Out of the group's stash, forty-three grams were allocated for Defendant. Defendant never had physical possession of the entire forty-three grams. Instead, like the other members of the group, he would go to Bryant to obtain only those amounts he needed to make a drug sale. However, unlike the other members of the group, Defendant did not pay Bryant for the amounts he received. Bryant testified that this arrangement was worked out between Defendant and Zanders, and that he simply did what he was told by Zanders. Of the amount set aside for Defendant, the ledger shows that he was given twenty-five grams, leaving eighteen grams in the stash.[1] It is these eighteen grams that forms the basis for the parties' dispute.

**2.**    *All Ledger Amounts are Properly Attributed to Defendant*

The parties' positions are not complex. Defendant asserts that, because he never took possession of the eighteen grams, they should not be included in the drug quantity calculation. The Government, on the other hand, argues that since the entire forty-three grams was "available" to Defendant, it must be included in the calculation. Disappointingly, neither the Government nor the Defendant has provided the Court with any law or legal argument in support of their position. Both simply declare the correctness of their conclusion. All legal analysis, then, has been left to the Court.

---

[1] Defendant argues that he only received seventeen grams of fentanyl from the stash. The discrepancy was caused by one ten-gram delivery that Defendant asserts was diluted. As the Government notes, this argument is a non-starter. Under U.S.S.G. § 2D1.1, drug quantity is determined from "the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (A). Concentration can only be considered where the non-narcotic substances "must be separated from the controlled substance before the controlled substance can be used." *Id*., cmt. n. 1; *see also United States v. Block*, 705 F.3d 755, 759 (7th Cir. 2013). There is no evidence that the ten-gram delivery, even in a diluted form, was anything but usable drugs. Accordingly, the entire weight of that delivery must be considered.

2

After researching the issue on its own, the Court must side with the Government. Where there exists an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance is used to determine the offense level unless the sale is completed, and the amount delivered more accurately reflects the scale of the offense. U.S.S.G. § 2D1.1, cmt. n. 5. The Court is not, therefore, bound to consider only amounts sold when determining drug quantity.

True, the Application Note is not a perfect fit here. Defendant had no express agreement with anyone to sell the entire forty-three grams of fentanyl, and certainly had not negotiated the "price, quantity, location," and other details of a future transaction. *United States v. Ruiz*, 932 F.2d 1174, 1184 (7th Cir. 1991). However, Defendant had the intent and ability to sell the entire amount. The evidence shows that all prior amounts Defendant retrieved from the "stash" were sold by him. There is no evidence that Defendant ever disavowed the remaining amounts. Nor is there a suggestion that the allocated amounts were for Defendant's personal use. Instead, for all intents and purposes Defendant had a drug stash of forty-three grams of fentanyl from which he dealt. The fact that someone else held the stash is of no consequence.

The Court's conclusion is bolstered by the peculiar arrangement that Defendant apparently had with Zanders in relation to Defendant's allocation. Unlike every other member of the Thrust Godz, Defendant did not have to pay Bryant for fentanyl retrieved from the stash. Instead, he simply requested an amount and it was given. This undisputed evidence is hard to square with Defendant's assertion that he had never paid for the forty-three grams allocated to him. But even if Defendant did not pay for his share of the fentanyl, he had a more concrete and immediate possessory interest in his share than did the other members of the group. The existence of this interest leaves the Court with little difficulty concluding that the entire amount can be allocated to Defendant.

Having determined that Defendant is responsible for the full forty-three grams, his base offense level is 24 regardless of how the Court would rule on his objection related to the pills found in the bedroom. *See* U.S.S.G. § 2D1.1(c). Accordingly, Defendant's objection to the drug quantity calculation is OVERRULED, and his base offense level is 24.

**B.     Maintaining a Premises**

The guidelines provide for a two-level sentence enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). This includes "storage of a controlled substance for the purpose of distribution." *Id*. cmt. n.17. In determining whether a defendant "maintained" a premises, the Court must consider any possessory interest in the premises as well as the extent to which the defendant controlled access to, or activities at, the premises. *Id*. The application notes clarify that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id*.

**1.     *The Fairfield View Place Residence***

The Government proposes three arguments, two based on actual premises and the third on joint criminal conduct, upon which it asserts that § 2D1.1(b)(12) enhancement can be based. The first is the Fairfield View Place residence, described in the record as the residence of Bronte Milton. In support of attaching the enhancement to this premises, the Government notes that Defendant kept clothes there and admitted to dealing approximately two grams of fentanyl out of the residence on one occasion.

On this sparse record, the Court cannot find that the enhancement would apply to Defendant's activities at the Fairfield View Place residence. The Court struggles to find any

4

concrete connection between Defendant and the residence. The Government's reference to Defendant keeping clothes at the residence is, at best, a small part of a larger description by Bryant regarding Defendant's living situation. The full quote is:

> So Henderson, he did have a room in Fairfield View, however, Henderson was primarily in Fort Wayne. When Henderson is in Fort Wayne, he's doing a lot of partying, he's out with a lot of women, he's drinking a lot. And yes, he may have a lot of clothes at the Fairfield View location, however he pretty much had a [nomadic] lifestyle where he was from place to place to place, because he was dealing with a lot of women.

(Tr. 33–34). This description, particularly its characterization of Defendant as nomadic, does little to tie Defendant to the Fairfield View Place residence. Certainly, it is a far stretch from a connection that could be called maintaining the premises.

The Government's reliance on Defendant's lone drug sale out of the residence is similarly unpersuasive. "[T]o determine whether drug distribution was a primary or incidental use, the district courts are not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses." *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017) (per curiam). Instead, "the sentencing court should focus on both the frequency and significance of the illicit activities." *Id*. "Neither a specific frequency nor a particular significance automatically warrants applying the enhancement." *United States v. Sanchez*, 710 F.3d 724, 731 (7th Cir. 2013), *vacated on other grounds*, *Sanchez v. United States*, 571 U.S. 801 (2013). "Rather, we consider the two in tandem and determine whether the prohibited purpose can be fairly described as a 'primary or principal' use of the premises." *Id*. Factors relevant to this analysis include "quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Contreras*, 874 F.3d at 284.

The Court does not find that a single episode of drug dealing would meet the test for primary use. *See United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008) (holding that drug

activity must occur "for a sustained period of time"). The amount dealt was relatively small, there was only one apparent customer interaction, Defendant did not keep the business records for the group, and the Government does not point to the discovery of "tools of the trade." The Court finds no support for the assessment of the enhancement with respect to the Fairfield View Place residence.

**2.** *Roadway Inn*

The Government next points to the Roadway Inn as a potential premises that Defendant maintained for the purpose of distributing drugs. The record reflects that the Thrust Godz would regularly have their drug customers rent rooms at the Roadway Inn, with members of the group going to those rooms to perform drug transactions. With respect to Defendant, the Government identifies a single sale at the Roadway Inn, a meeting with a confidential information a half-mile away from the Roadway Inn, and an apparent reference to the Roadway Inn as a "compound" where he could obtain fentanyl. (ECF No. 110 at 9).

The Court finds that the connection between the Roadway Inn and Defendant's drug distribution activities is, like the connection to the Fairfield View Place residence, far too tenuous to support the application of the enhancement. Since the customers rented the rooms, Defendant had no possessory interest in the property nor ability to control access to, or activities in, the rooms. Nor, as the Court noted above, does a single incident of drug dealing demonstrate that Defendant used the Roadway Inn to distribute drugs over a sustained period. Accordingly, the Court does not find that Defendant's activities at the Roadway Inn support the application of the enhancement.

**3.** *Jointly Undertaken Activity*

Finally, the Government asserts that, since other members of the Thrust Godz maintained premises for the purposes of distributing narcotics, their actions can be imputed to the Defendant

6

under the theory of jointly undertaken activity. In support, the Government relies on Judge Springmann's decision in *United States v. Lewis*, 2020 WL 1164434 (N.D. Ind. March 11, 2020), which, in turn, relied on *United States v. Holmes*, 767 F.App'x 831 (11th Cir. 2019). Those cases found that ""[n]othing in § 2D1.1(b)(12) prohibits a sentencing court from imposing the premises enhancement based on the jointly undertaken criminal activity of co-conspirators" and that, unlike other sections of the guidelines where jointly undertaken criminal activity cannot be considered during sentencing, "§ 2D1.1(b)(12) lacks an application note limiting the effect of § 1B1.3(a)(1)(B)." *Lewis*, 2020 WL 1164434 at 11; *Holmes*, 767 F.App'x. at 838–39.

The Court recognizes Judge Springmann's decision but cannot reach the same conclusion here. First, the Court notes that no published decision imposes vicarious liability under § 2D1.1(b)(12). Rather, the only reported opinion cited in *Lewis*, *United States v. Miller*, 698 F.3d 699 (8th Cir. 2012), states that "it is not sufficient that others possess the requisite purpose" for the enhancement to apply. *Id*. at 706, quoting *United States v. Payton*, 636 F.3d 1027, 1043 (8th Cir. 2011). In the absence of some reported, supporting precedent, the Court is not inclined to extend § 2D1.1(b)(12) beyond its plain language.

Even if the Court did subscribe to the reasoning in *Lewis*, it would not apply it here. The evidence in the record does not demonstrate that the Thrust Godz' drug dealing was "jointly undertaken criminal activity." The information in the record shows that each member had his own customer list. As Bryant testified, "everybody was essentially out for themselves." (T. 25) Each member was responsible for his or her own money and responsible for obtaining the drugs needed to make their sales. Each member largely operated out of different locations. True, the members had a single source (Zanders and then Bryant), but it appears to the Court that each member was effectively his own independent drug contractor.

7

The Court does not find that this evidence is suggestive of jointly undertaken criminal activity. Several factors are relevant in determining the scope of jointly undertaken criminal activity: (1) the existence of a single scheme, *see United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir.2000); (2) similarities in *modus operandi*, *see id*. at 1028–29 (noting that the defendants "took virtually identical steps in setting up mailing addresses and bank accounts for the fictional . . . vendors" closely in time); (3) coordination of activities among schemers, *see id*. at 1028 (multiple telephone calls between phones associated with the defendants confirmed that they were coordinating their activities); *United States v. Giang*, 143 F.3d 1078, 1081 (7th Cir. 1998) (stating that the defendant's "close collaboration with his cohorts" established a joint undertaking); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(8); (4) pooling of resources or profits, *see Adeniji*, 221 F.3d at 1028 (sharing of proceeds); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(6); (5) knowledge of the scope of the scheme, *see United States v. Thomas*, 199 F.3d 950, 954 (7th Cir. 1999); and (6) length and degree of the defendant's participation in the scheme, *see id*.

Applying these factors here, the Court does not find there to be a single scheme, but instead multiple schemes run by each individual member. There was a similar *modus operandi* amongst the group but, then again, there are only so many ways one can sell drugs. There appears to have been little coordination among the members and no pooling of profits. While Zanders and Bryant appear to have known the scope of the group's activities by virtue of keeping the ledger, there is no evidence that this information was known more broadly throughout the group, or by Defendant specifically. Finally, while Defendant admits to "covering" for other members, it does not appear that he was involved generally with other members' activities.[2] Accordingly, the Court declines to

---

[2] The Court notes that the Government does not attempt to invoke the "jointly undertaken criminal activity" concept in determining the drug quantity attributable to Defendant, perhaps demonstrating the weakness in applying the concept to the Thrust Godz generally.

apply § 2D1.1(b)(12) by virtue of the activities of Defendant's fellow Thrust Godz. Defendant's objection on this point is SUSTAINED.

**C.     Conclusion**

For the foregoing reasons, Defendant's objection to the drug quantity calculation is OVERRULED, and his objection to the two-level enhancement under U.S.S.G. § 2D1.1(b)(12) is SUSTAINED. The probation officer is DIRECTED to draft a revised presentence investigation report consistent with this Opinion and Order.

SO ORDERED on November 23, 2020.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT